**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (973) 313-1887
Facsimile: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRENT PARRIS, derivatively on behalf of Nominal Defendant ADMA BIOLOGICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN A. ELMS, ADAM S. GROSSMAN, JERROLD B. GROSSMAN, ALISON C. FINGER, LAWRENCE P. GUIHEEN, YOUNG T. KWON, EDUARDO RENE SALAS, and BRAD TADE,<br><br>Defendants,<br><br>And<br><br>ADMA BIOLOGICS, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Brent Parris ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant ADMA Biologics, Inc. ("ADMA" or the "Company"), brings this Verified Shareholder Derivative Complaint against Steven A. Elms

("Elms"), Adam S. Grossman ("Grossman"), Jerrold B. Grossman ("J. Grossman"), Alison C. Finger ("Finger"), Lawrence P. Guiheen ("Guiheen"), Young T. Kwon ("Kwon"), Eduardo Rene Salas ("Salas"), and Brad Tade ("Tade") (collectively, the "Individual Defendants" and, together with ADMA, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by ADMA with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action against certain current and former ADMA officers and members of the Company's Board of Directors (the "Board") for breaches of their fiduciary duties between at least August 9, 2024 and March 25, 2026 inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. ADMA is a commercial biopharmaceutical company dedicated to manufacturing, marketing, and developing specialty plasma-derived biologics, including ASCENIV. Throughout the Relevant Period, ADMA's SEC filings represented that the Company properly recognized revenue, fully disclosed its related-party transactions, and maintained effective disclosure controls. The Company's 2025 proxy statement likewise assured investors that the Board and management appropriately oversaw the risks facing ADMA. The Individual Defendants signed, certified, approved, and/or permitted these statements to be disseminated to investors.

3. Contrary to these representations, ADMA allegedly induced distributors to accept excess amounts of ASCENIV by offering rebates and extended payment terms, allowing the Company to recognize revenue on product that exceeded actual end-market demand. Information obtained from one of ADMA's largest distributors and a former sales representative indicated that ADMA encouraged distributors to order unwanted product to satisfy the Company's sales expectations. Third-party sales data likewise allegedly revealed a substantial and widening gap between ADMA's reported ASCENIV revenues and actual utilization.

4. The Individual Defendants also allegedly concealed ADMA's relationship with Genesis BioPharma Services, a distributor that appears to be controlled by Defendant Jerrold B. Grossman, operates from ADMA's corporate headquarters, and lists ASCENIV among its product offerings. Although ADMA's public filings disclosed purchases from the similarly named GenesisBPS, which was owned by Defendants Grossman and J. Grossman, the Company did not disclose the extent of its sales to Genesis BioPharma Services. As a result, ADMA's statements concerning its related-party transactions, revenue recognition, internal controls, and risk oversight were materially false and misleading.

5. The truth began to emerge on March 24, 2026, when Culper Research reported that as much as $200 million of ASCENIV inventory remained in the distribution channel and that, absent channel stuffing, ADMA would have reported a 3% decline in 2025 revenue rather than the 20% growth it reported. ADMA's stock price fell from $13.59 per share before the report to $8.29 per share by March 26, 2026. The alleged misconduct resulted in the filing of the Securities Class Action and has caused ADMA to incur substantial financial losses, including defense costs and potential class-wide liability, as well as reputational harm and loss of goodwill.

6. In light of the Individual Defendants' misconduct, the Company and Defendants Grossman, J. Grossman, and Tade were named as defendants in a federal securities fraud class action lawsuit that is pending in the United States District Court for the District of New Jersey under the caption: *Mazzarino v. ADMA Biologics, Inc.*, Case No. 2:26-cv-06918 (D.N.J.) (the "Securities Class Action.") The Securities Class Action has further subjected ADMA to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), Section 20(a) of the Exchange Act (15 U.S.C. §78t(a)), and Section 14(a) of the Exchange Act (15 U.S.C. §78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

8. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

10. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because ADMA maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information,

occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

11. Plaintiff is a current shareholder of ADMA and has continuously held ADMA stock at all relevant times.

12. Nominal Defendant ADMA is incorporated in Delaware and its headquarters are located at 465 State Route 17, Ramsey, New Jersey. ADMA's common shares trade on the Nasdaq under the ticker symbol "ADMA."

13. Defendant Elms has served as a Company director since 2007. Defendant Elms serves as the Chairman of the Board. According to the Company's public filings with the SEC, Defendant Elms received $351,176 in 2024 and $446,235 in 2025, respectively, in total compensation from the Company.

14. Defendant Grossman co-founded the Company and has served as a Company director since 2007, and as President and Chief Executive Officer ("CEO") since October 2011. According to the Company's public filings with the SEC, Defendant Grossman received $7,918,734 in 2024 and $10,237,326 in 2025, respectively, in total compensation from the Company.

15. Defendant J. Grossman co-founded the Company, has served as a Company director since 2007, and previously served as CEO from 2007 to October 2011. According to the Company's public filings with the SEC, Defendant J. Grossman received $344,399 in 2024 and $439,985 in 2025, respectively, in total compensation from the Company.

16. Defendant Finger has served as a Company director since September 2023. According to the Company's public filings with the SEC, Defendant Finger received $305,977 in 2024 and $416,235 in 2025, respectively, in total compensation from the Company.

17. Defendant Guiheen has served as a Company director since July 2012. Defendant Guiheen also serves as a member of the Board's Audit Committee. According to the Company's public filings with the SEC, Defendant Guiheen received $334,774 in 2024 and $434,985 in 2025, respectively, in total compensation from the Company.

18. Defendant Kwon has served as a Company director since October 2021. Defendant Kwon also serves as Chair of the Board's Audit Committee. According to the Company's public filings with the SEC, Defendant Kwon received $333,240 in 2024 and $444,985 in 2025, respectively, in total compensation from the Company.

19. Defendant Salas has served as a Company director since December 2024. Defendant Salas also serves as a member of the Board's Audit Committee. According to the Company's public filings with the SEC, Defendant Salas received $214,537 in 2024 and $412,485 in 2025, respectively, in total compensation from the Company.

20. Defendant Tade served as the Company's Chief Financial Officer until February 25, 2026. According to the Company's public filings with the SEC, Defendant Tade received $2,936,435 in 2024 and $2,823,630 in 2025, respectively, in total compensation from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

21. By reason of their positions as officers, directors, and/or fiduciaries of ADMA and because of their ability to control the business and corporate affairs of ADMA, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

22. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

23. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

24. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

25. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a

reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**ADMA'S CODE OF ETHICS AND BUSINESS CONDUCT**

26. The Company maintains a Code of Ethics and Business Conduct (the "Code of Conduct"), which states that it "applies to all ADMA directors, officers and employees" and was adopted to, among other things, "promote honest and ethical business conduct…"

27. Under a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states:

> The Company requires the highest ethical and moral standards in its business conduct, including compliance with all governing laws and regulations. Covered persons must obey all applicable laws, rules, and regulations of the United States and/or the jurisdiction in which they are conducting business. Compliance with the law includes both following the letter and the spirit of the law. Consequently, business activities should be conducted with the utmost integrity and honesty.

28. The Code of Conduct states that, "A conflict of interest [ ] may exist when the interests or concerns of any director, officer or employee, or their immediate family, or any party, group, or organization to which the covered person has allegiance, may be seen as competing with the interests of the Company."

29. Under a section titled "Insider Trading Prohibited," the Code of Conduct states:

> Since ADMA is publicly-owned, the Company is legally obligated to vigilantly safeguard its Material Nonpublic Information (as defined in the Company's Insider Trading Policy) from improper disclosure. Under the federal securities laws, it is unlawful for all persons in possession of Material Nonpublic Information about the Company, including our directors, officers and employees and the Company itself and its subsidiaries, to (i) buy or sell ADMA securities, (ii) improperly disclose or give Material Nonpublic Information to others who may trade on the basis of that information, or (iii) advise others how to trade while in possession of Material Nonpublic Information. All covered persons are bound by the Company's Insider Trading Policy (Appendix D).

30. Under a section titled "Communications," the Code of Conduct states:

As a publicly-owned company, ADMA is obligated to ensure that communications to the public and regulatory agencies are timely, accurate, and transparent. ADMA must comply with the requirements imposed by regulatory agencies, including the Securities and Exchange Commission (the "SEC"). Covered persons may be asked to provide information necessary to ensure accurate public or regulatory reporting by the Company. The Company expects employees, officers and directors to do their part by promptly providing accurate answers to inquiries from Company employees and agents handling such reporting. Any inquiries from external sources should be redirected to a person authorized and designated to respond on the Company's behalf. All covered persons are bound by the Company's Corporate Communications Policy (Appendix E).

31. Under a section titled "Fair Dealing," the Code of Conduct states:

All of the business activities of the Company are highly competitive, and it is the policy of the Company to compete aggressively, but fairly. Accordingly, covered persons must never make a deliberate misrepresentation concerning the Company or its business operations. Management, at all levels, must be informed at all times of matters which might be considered sensitive in preserving the Company's reputation. Concealment of information or false and misleading statements will not be tolerated. Covered persons are prohibited from misappropriating or inducing the disclosure of confidential information from other companies.

## ADMA'S AUDIT COMMITTEE CHARTER

32. The Company also maintains an Audit Committee Charter, which states:

The primary purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of ADMA Biologics, Inc. (the "Company") in overseeing the accounting and financial reporting processes of the Company and the audits of the Company's financial statements. In that regard, the Committee assists the Board in connection with: (a) reviewing the financial reports and other financial information prepared by the Company for submission to any governmental or regulatory body or the public and monitoring the integrity of such financial reports; (b) reviewing the Company's systems of internal controls established for finance, accounting, legal compliance and ethics; (c) reviewing the Company's accounting and financial reporting processes generally and the audits of the financial statements of the Company; (d) monitoring compliance with legal regulatory requirements; (e) monitoring the engagement, qualifications, independence and performance of the Company's registered independent public accounting firm and approving the terms of engagement of the Company's independent auditor; (f) reviewing the performance of the Company's internal audit function and when applicable to the Company, preparing any reports required of the Committee under the rules of the Securities and Exchange Commission (the "SEC"); and (g) providing effective communication among the Board, senior and financial management and the Company's registered independent public accounting firm.

33. The Audit Committee Charter states that the Audit Committee shall, among other things:

> Review with management and the registered independent public accounting firm the audited financial statements and related footnotes and the clarity of the disclosures in the financial statements, including a review of major issues regarding accounting and auditing principles and practices and any related-party transactions as well as the adequacy of internal controls that could significantly affect the Company's financial statements, and review and consider with the registered independent public accounting firm the matters required to be discussed by Statement on Auditing Standards ("SAS") 61 and Auditing Standards No. 16.
>
> Review and discuss with the registered independent public accounting firm matters relating to the annual audit, including the proposed audit scope and plan and the annual audit results and the Committee's process for discussing critical audit matters.
>
> Based upon its review and discussions with management and the independent auditor, recommend to the Board whether the annual audited financial statements and related footnotes should be included in the Company's Annual Report on Form 10-K. Based upon its review and discussions with management and the independent auditor, recommend to the Board whether the quarterly financial statements and related footnotes should be included in the Company's Quarterly Reports on Form 10-Q.
>
> Review with management and the registered independent public accounting firm their judgments about the quality, not just the acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity and transparency of the disclosures in the financial statements.
>
> To the extent that it deems appropriate, review with management its evaluation of the Company's procedures and controls designed to assure that information required to be disclosed in the Company's periodic reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC for the filing of such reports ("Disclosure Controls"), and consider whether any changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls.
>
> Prepare the report required by the rules of the SEC of public company audit committees to be delivered to the Board of Directors.
>
> Provide any recommendations, certifications, and reports that may be required by NASDAQ or the SEC, including the report of the Committee that must be included in the Company's annual proxy statement or Annual Report on Form 10-K in accordance with the rules of the SEC.

***

> Meet periodically with management and the registered independent public accounting firm to review the Company's major financial risk exposures and the steps taken to monitor and control such exposures.
>
> Oversee the Company's risk management policies and practices and update the full Board on a periodic basis as to the adequacy of the Company's policies and procedures in the risk and control environment.

***

> Oversee the Company's internal audit function, and review, as necessary, various responsibilities and matters relating to the internal audit function, such as the proposed audit plan and results, internal audit budget and staffing and the appointment of the head of internal audit.

***

> Review disclosures made to the Committee by the Company's Principal Executive Officer and Principal Financial Officer about any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls

## SUBSTANTIVE ALLEGATIONS

34. On August 8, 2024, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2024 (the "Q2 2024 Report"). Attached to the Q2 2024 Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

35. The Q2 2024 Report contained the following statement regarding related party transactions:

> During the six months ended June 30, 2024 and 2023, the Company purchased certain specialized medical equipment and services primarily related to the Company's plasma collection centers, as well as personal protective equipment, from GenesisBPS and its affiliates ("Genesis"), aggregating to $0.1 million and $0.2 million, respectively. Genesis is owned by Dr. Grossman and Mr. Grossman.

36. The statement above was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which, in fact, operates out of ADMA's corporate headquarters.

37. On November 7, 2024, after the market closed, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2024 (the "Q3 2024 Report"). Attached to the Q3 2024 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

38. The Q3 2024 Report contained the following statement regarding related party transactions:

> During the nine months ended September 30, 2024 and 2023, the Company purchased certain specialized medical equipment and services primarily related to the Company's plasma collection centers, as well as personal protective equipment, from GenesisBPS and its affiliates ("Genesis"), aggregating to $0.2 million and $0.4 million, respectively. Genesis is owned by Dr. Grossman and Mr. Grossman.

39. The statement above was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which, in fact, operates out of ADMA's corporate headquarters.

40. On March 18, 2025, after the market closed, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Annual Report"). The 2024 Annual Report was signed by Defendants Grossman, Tade, Elms, J. Grossman, Finger, Guiheen, Kwon, and Salas. Attached to the 2024 Annual Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

41. The 2024 Annual Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2024. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any set of controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of December 31, 2024, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level.*** [1]

42. The statement above was materially false at the time it was made because ADMA lacked effective internal controls, as a result of a scheme to use channel stuffing to materially inflate ADMA's revenues, and as a result of an undisclosed related party transaction.

43. The 2024 Annual Report contained the following statement regarding related party transactions:

> During the years ended December 31, 2024, 2023 and 2022, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS and its affiliates ("Genesis") in the amount of $0.2 million, $0.4 million and $0.2 million, respectively. Genesis is owned by Dr. Grossman and Adam Grossman.

---

[1] Unless otherwise stated, all emphasis is added.

44. The statement above was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which, in fact, operates out of ADMA's corporate headquarters.

45. The 2024 Annual Report contained the following statement regarding revenue recognition:

> Product revenue is recognized when the customer is deemed to have control over the product and the performance obligation is satisfied. Control is determined based on when the product is shipped or delivered and title passes to the customer. Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. ***Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on contractual arrangements, historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future developments and other factors.***

46. The statement above was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

47. On April 15, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy"). The 2025 Proxy sought stockholder approval to, among other things: (i) re-elect Defendants J. Grossman and Guiheen to the Board; and (ii) approve, on an advisory basis, the Company's executive compensation, including for Defendants Grossman and Tade. The 2025 Proxy was approved by the Board, which consisted of Defendants Elms, Grossman, J. Grossman, Guiheen, Kwon, Finger, and Salas.

48. The 2025 Proxy assured investors that the Board and management were overseeing risks to the Company, stating, in relevant part:

Our Board evaluates its leadership structure and role in risk oversight on an ongoing basis. Our Board is currently composed of seven directors, five of whom are independent, in accordance with the Nasdaq independence listing standards. If the director nominees are each reelected, the Company's Board will consist of seven directors. Presently, the Board has the following standing committees: Audit Committee, Compensation Committee, and Governance and Nominations Committee. Each of the standing committees is comprised solely of independent directors. In accordance with Nasdaq rules, our Audit Committee is responsible for overseeing risk management and updates the full Board periodically.

To assure effective and independent oversight of management, our Board currently operates with the roles of President and Chief Executive Officer on the one hand and Chairman of the Board on the other separated in recognition of the differences between these roles in the management of the Company. Although our Board does not have a policy as to whether the same individual may serve as both Chairman and President and Chief Executive Officer, or if the roles must be separate, our Board believes that its current leadership structure provides the most effective leadership model for our Company, as it promotes balance between the Board's independent authority to oversee our business and the President and Chief Executive Officer and his management team, which manages the business on a day-to-day basis. The President and Chief Executive Officer has overall responsibility for all aspects of our operation, while the Chairman has a greater focus on governance of the Company, including oversight of the Board. We believe this balance of shared leadership between the two positions is a strength for the Company. As our Chairman, Mr. Elms calls and chairs regular and special meetings of the Board, chairs and presides at annual or special meetings of stockholders, provides meaningful input into the agenda of Board meetings, authorizes the retention of outside advisors, consultants and legal counsel who report directly to the Board and consults frequently with committee chairs. Additionally, by permitting more effective monitoring and objective evaluation of the President and Chief Executive Officer's performance, this structure increases the accountability of the President and Chief Executive Officer. A separation of the President and Chief Executive Officer and Chairman roles also prevents the former from controlling the Board's agenda and information flow, thereby reducing the likelihood that the President and Chief Executive Officer would abuse his power.

The Board, acting primarily through the Audit Committee, is also responsible for oversight of our risk management practices, while management is responsible for the day-to-day risk management processes. This division of responsibilities is the most effective approach for addressing the risks facing the Company, and the Company's board leadership structure supports this approach. Through our President and Chief Executive Officer, and other members of management, the Board receives periodic reports regarding the risks facing the Company. In addition, the Audit Committee assists the Board in its oversight role by receiving periodic reports regarding our risk and control environment.

49. On May 7, 2025, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended March 31, 2025 (the "Q1 2025 Report"). Attached to the Q1 2025 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

50. The Q1 2025 Report contained the following statement regarding the Company's internal controls:

> We designed our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.
>
> Under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures as of March 31, 2025. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of March 31, 2025 were effective*** to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures. A control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. We do not expect that our disclosure controls and procedures or our internal control over financial reporting are able to prevent with certainty all errors and all fraud.

51. The statement above was materially false at the time it was made because ADMA lacked effective internal controls, because of a scheme to use channel stuffing to materially inflate ADMA's revenues, and an undisclosed related party transaction.

52. The Q1 2025 Report contained the following statement regarding a related party transaction:

> During the three months ended March 31, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS in the amount of $34 thousand and $0.1 million, respectively. Genesis is owned by Dr. Grossman and Adam Grossman.

53. The statement above was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which, in fact, operates out of ADMA's corporate headquarters.

54. The Q1 2025 Report contained the following statement about revenue recognition:

> Revenues are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected through the Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediates; and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and selected countries in North Africa and the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income over the term of the Biotest license, representing a period of approximately 22 years.
>
> ***Product revenue is recognized when the customer is deemed to have control over the product. Control is determined based on when the product is shipped or delivered, depending on the sales terms, and title passes to the customer. Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future experience and other factors.***

55. The statement above was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

56. On August 6, 2025, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended June 30, 2025 (the "Q2 2025 Report"). Attached to the Q2 2025 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

57. The Q2 2025 Report contained the following statement about the Company's internal controls:

> We designed our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission (SEC)'s rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.
>
> Under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures as of June 30, 2025. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of June 30, 2025, were effective*** to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.
>
> A control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. We do not expect

> that our disclosure controls and procedures or our internal control over financial reporting are able to prevent with certainty all errors and all fraud.

58. The statement above was materially false at the time it was made because ADMA lacked effective internal controls, because of a scheme to use channel stuffing to materially inflate ADMA's revenues, and an undisclosed related party transaction.

59. The Q2 2025 Report contained the following statement regarding a related party transaction:

> During the six months ended June 30, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS in the amount of $0.1 million. Genesis is owned by Dr. Grossman and Adam Grossman.

60. The statement above was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which, in fact, operates out of ADMA's corporate headquarters.

61. The Q2 2025 Report contained the following statement (in part) about revenue recognition:

> Revenues are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected through the Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediates; and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and selected countries in North Africa and the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income over the term of the Biotest license, representing a period of approximately 21 years.
>
> Product revenue is recognized when the customer is deemed to have control over the product. Control is determined based on when the product is shipped or delivered, depending on the sales terms, and title passes to the customer. ***Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin***

> ***products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future experience and other factors.***

62. The statement above was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

63. On November 5, 2025, the Company filed with the SEC its Quarterly Report on Form 10-Q for the quarter ended September 30, 2025 (the "Q3 2025 Report"). Attached to the Q3 2025 Report were signed certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

64. The Q3 2025 Report contained the following statement about the Company's internal controls:

> We designed our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), to provide reasonable assurance that information required to be disclosed by us in reports we file or submit under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission (SEC)'s rules and forms, and (ii) accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.
>
> Under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of our disclosure controls and procedures as of September 30, 2025. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures as of September 30, 2025 were effective*** to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (ii) accumulated and communicated to our

management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding disclosures.

A control system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the control system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. We do not expect that our disclosure controls and procedures or our internal control over financial reporting are able to prevent with certainty all errors and all fraud.

65. The statement above was materially false at the time it was made because ADMA lacked effective internal controls, because of a scheme to use channel stuffing to materially inflate ADMA's revenues, and an undisclosed related party transaction.

66. The Q3 2025 Report contained the following statement regarding a related party transaction:

During the nine months ended September 30, 2025 and 2024, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS ("Genesis") in the amount of $0.2 million. Genesis was owned by Dr. Grossman and Adam Grossman until September 30, 2025.

67. The statement above was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which, in fact, operates out of ADMA's corporate headquarters.

68. The Q3 2025 Report contained the following statement (in part) about revenue recognition:

Revenues are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected through the Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediates; and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and selected countries in North Africa and the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income

> over the term of the Biotest license, representing a period of approximately 21 years.
>
> Product revenue is recognized when the customer is deemed to have control over the product. Control is determined based on when the product is shipped or delivered, depending on the sales terms, and title passes to the customer. ***Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future experience and other factors***.

69. The statement above was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

70. On February 25, 2026, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2025 (the "2025 Annual Report"). The 2025 Annual Report was signed by Defendants Grossman, Tade, Elms, J. Grossman, Finger, Guiheen, Kwon, and Salas. Attached to the 2025 Annual Report were certifications pursuant to SOX signed by Defendants Grossman and Tade attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

71. The 2025 Annual Report contained the following statement about the Company's internal controls:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2025. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to

> ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any set of controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of December 31, 2025, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

72. The statement above was materially false at the time it was made because ADMA lacked effective internal controls, because of a scheme to use channel stuffing to materially inflate ADMA's revenues, and an undisclosed related party transaction.

73. The 2025 Annual Report contained the following statement about a related party transaction:

> During the years ended December 31, 2025, 2024 and 2023, the Company purchased certain specialized equipment and repair services used for the collection and processing of source plasma from GenesisBPS and its affiliates ("Genesis") in the amount of $0.1 million, $0.2 million and $0.4 million, respectively. Genesis was owned by Dr. Grossman and Adam Grossman until September 30, 2025.

74. The statement above was materially false at the time it was made because it disclosed purchases from GenesisBPS, but not sales to the similarly named Genesis BioPharma Services, which, in fact, operates out of ADMA's corporate headquarters.

75. The 2025 Annual Report contained the following statement (in part) about revenue recognition:

> Revenues for the years ended December 31, 2025, 2024 and 2023 are comprised of (i) revenues from the sale of the Company's immunoglobulin products, ASCENIV, BIVIGAM and Nabi-HB, (ii) product revenues from the sale of human plasma collected by the Company's Plasma Collection Centers business segment, (iii) contract manufacturing and laboratory services revenue, (iv) revenues from the sale of intermediate by-products and (v) license and other revenues primarily attributable to the out-licensing of ASCENIV to Biotest AG ("Biotest") in 2012 to market and sell this product in Europe and certain countries in Northern Africa and

> the Middle East. Biotest has provided the Company with certain services and financial payments in accordance with the related Biotest license agreement and is obligated to pay the Company certain amounts in the future if certain milestones are achieved. Deferred revenue is amortized into income over the term of the Biotest license, representing a period of approximately 22 years.
>
> Product revenue is recognized when the customer is deemed to have control over the product and the performance obligation is satisfied. Control is determined based on when the product is shipped or delivered and title passes to the customer. ***Revenue is recorded in an amount that reflects the consideration the Company expects to receive in exchange. Revenue from the sale of the Company's immunoglobulin products is recognized when the product reaches the customer's destination, and is recorded net of estimated rebates, wholesaler distribution and related fees, customer incentives, including prompt pay discounts, wholesaler chargebacks, group purchasing organization fees and reimbursements for patient assistance. These estimates are based on contractual arrangements, historical experience and certain other assumptions, and while the Company believes that such estimates are reasonable, they are subject to change based on future developments and other factors.***

76. The statement above was materially false at the time it was made because it omitted that ADMA ships unwanted amounts of ASCENIV, known as channel stuffing, to create an appearance of heightened demand and revenue.

77. The 2025 Annual Report stated that (in thousands), the Company had received $362.5 million in net revenues from ASCENIV.

78. The $362.5 million figure was materially false at the time it was reported because the Company used channel stuffing throughout the Relevant Period to create an appearance of revenue and growth in sales for ASCENIV.

79. The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) ADMA engaged in an undisclosed related party transaction; (ii) ADMA used channel stuffing to create an appearance of revenue; (iii) the Board and Company management failed to oversee risks to the Company; and (iv) as a result of the foregoing, the Company's public statements regarding its business,

operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge***

80. On March 24, 2026, Culper Research ("Culper") issued a report entitled "ADMA Biologics Inc (ADMA): Channel Stuffing, an Undisclosed Related Party Distributor, and -3% Real Growth in 2025 vs. +20% Reported" (the "Report").

81. The Report stated the following:

> We are short ADMA Biologics ("ADMA", "the Company"). We believe ADMA's reported growth is a fiction driven more than entirely by a de facto channel stuffing scheme and an undisclosed related party distributor. We estimate that, absent channel stuffing, ADMA revenues declined 3% in 2025 vs. +20% reported. The ASCENIV growth story is already over, and ADMA shares are headed lower.
>
> ***
>
> ADMA Biologics is a reverse merger founded by father-son duo Jerrold and Adam Grossman, who remain Vice Chairman and CEO today. ADMA's flagship product ASCENIV is an IVIG therapy priced at ~$900/gram, a 6-10x premium to standard IVIGs on the basis that its high-RSV-titer blend lowers patient infection risk. ADMA, however, has never run a head-to-head study, so ASCENIV holds a standard PI label. Payors treat ASCENIV as functionally identical to standard IVIGs available at a fraction of the price, and have levied strict prior authorization requirements, step edits, and outright denials. Providers, facing reimbursement challenges, slowed their ordering, and distributors have been left with excess inventory. In the face of this backdrop, however, ADMA reported that ASCENIV revenues grew from $92.6 million in 2023 to $362.5 million in 2025. Shares have more than tripled over the past 3 years. We believe the ASCENIV growth story is total fiction owing entirely to channel stuffing.

82. The Report stated the following regarding part of Culper's basis for this opinion:

> We spoke with two high-level employees at one of ADMA's two largest distributors, each of whom told us independently that starting in 2025, ADMA induced the distributor to stock excess ASCENIV by offering rebates and extended payment terms in order to meet order expectations. Distributors take unwanted product without having to pay for it, ADMA books the revenues, and reports growth that was never there.

83. The Report stated that Culper had asked the distributor if it had "engaged in any conversations with ADMA that might indicate ADMA's request owed to the Company's expectations of increased demand for ASCENIV." The Report stated that a distributor "denied this notion, stating instead that actual end-market sales are not increasing at all, from what they can tell."

84. The Report quoted a former ADMA sales representative as saying that "they'll encourage them to order more to goose the channel, and then it just sits there."

85. Culper also stated in the Report: "We obtained ASCENIV sales data from a leading third party vendor, which reveals a significant and widening gap between reported ASCENIV revenues and ultimate utilization, even as growth has slowed over time. We estimate at least $200 million in ASCENIV inventory now sits in the channel."

86. The Report further stated:

> ASCENIV sales data we obtained from a leading third party data provider corroborates our view, suggesting that (a) there is a meaningful gap between ADMA-reported revenues and actual utilization, (b) this gap has widened significantly over time, and finally that (c) as much as $200 million in ASCENIV inventory sits in the channel.
>
> Recall that ADMA reports revenues upon delivery to customers (i.e., distributors, and that distributors sell onto end customers. The third-party data that we obtained, pictured below, reflects both ADMA's sales of ASCENIV directly to end customers under "buy and bill" type arrangements, as well as distributor/wholesaler sales to end customers. As such, we believe that it presents an accurate (and Company-favorable) representation of utilization.
>
> ***
>
> We acknowledge that generally speaking, a company will necessarily supply product to distributors in advance of demand. However, at ADMA, the divergence between ADMA's reported revenues and end usage has widened while revenue growth has decelerated – utilization is not catching up with channel stocking; it is falling further behind.

87. The Report also stated:

> We believe that, had ADMA held payment terms steady rather than extending terms to inflate reported revenues, the Company would have reported year-over-year revenue declines of 3% in 2025. In other words, more than the entirety of ADMA's reported growth is explained by channel stuffing. Our view is consistent with what ADMA's own distributor and physicians have told us – that "I'm not seeing any trends that signal that it's really growing" and that patients on ASCENIV have declined in early 2026.

88. The Report further stated the following about an undisclosed related party transaction:

> ADMA's problems don't end there [i.e., with channel stuffing]. The Company appears to distribute ASCENIV through Genesis BioPharma Services ("Genesis Bio"), a self-described "life sciences logistics provider" that appears to be controlled by Vice Chairman Jerrold Grossman, operates out of ADMA's own corporate headquarters, and explicitly lists ASCENIV among its product offerings, yet is never named in ADMA's related party disclosures. Tellingly, ADMA discloses purchases from the similarly named but distinct GenesisBPS (an equipment provider; also Grossman-controlled but acquired by GSI in October 2025), but the Company has never disclosed sales to the similarly named Genesis Bio. The apparent sleight of hand is notable: by disclosing GenesisBPS and omitting Genesis Bio, ADMA creates the impression of transparency while concealing what appears to be a material distribution relationship.

89. The Report further stated the following about the undisclosed third party:

> Our channel stuffing concerns are compounded by related party concerns, as ADMA appears to also distribute ASCENIV via Genesis BioPharma Services ("Genesis Bio")— a company that appears to be controlled by Vice Chairman Jerrold Grossman and lists ADMA's headquarters as its own corporate address.
>
> ADMA does disclose that the Company has made small purchases of "certain specialized equipment and repair services used for the collection and processing of source plasma …" from GenesisBPS (Genesis Blood Product Specialties), which was owned by Jerrold and Adam Grossman "until September 30, 2025." On October 1, 2025—coinciding with this disclosure—GSI Group announced that it would acquire GenesisBPS, which GSI described as "a designer and manufacturer of benchtop blood processing equipment and laboratory consumables."
>
> ***
>
> However, the similarly named Genesis BioPharma Services ("Genesis Bio") appears to be a distinct entity, referring to itself as "a division of Technomed Inc" even after the acquisition of GenesisBPS. Genesis BioPharma Services lists its corporate headquarters at 465 Route 17, South Ramsey, NJ – ADMA's corporate

> headquarters. We called Genesis Biopharma Services and the operator confirmed that we had reached Genesis BioPharma.
>
> ***
>
> Neither Genesis BioPharma nor Technomed are disclosed as subsidiaries of ADMA, and while ADMA discloses its purchases from GenesisBPS, the Company has never disclosed the extent of its sales to Genesis Bio. It is thus unclear to us exactly how much business ADMA could be doing with Genesis Bio, but we find this fact pattern concerning especially in the context of our earlier findings.

90. The Report noted the following, raising further concerns about the Company, including an auditor and director resignation, as well as Defendant Tade:

> ADMA's 17-year auditor CohnReznick resigned in 2024 and was replaced by KPMG, who charged 3x the price, and flagged critical audit matters in both 2024 and 2025. A month after CohnReznick's resignation, long-time director Bryant Fong – who had been with ADMA prior to its 2013 IPO – resigned. ADMA agreed to immediately vest his unvested RSUs. Just one month ago, ADMA disclosed that its CFO Brad Tade would be retiring, effective immediately, at just 52 years old.

91. The Report stated the following about internal sales of ADMA stock:

> ADMA now appears to be levering up its balance sheet to fund share repurchases, reflecting supposed "confidence in its long-term growth trajectory." This confidence is apparently not shared by insiders, who have collectively sold over $50 million in stock in the past 3 years. CEO Grossman has sold over $20 million and put in place a 10b5-1 sale plan in November 2025. Further, in January 2025, Grossman pledged 712,326 shares – then worth $12.8 million at $17.97 per share – against a personal credit facility. The timing is conspicuous.

92. On this news, the price of ADMA stock fell $2.26 per share, or 16.6%, to close at $11.33 per share on March 24, 2026, and a further $1.70, or 15%, on March 25, 2026.

93. On March 25, 2026, ADMA issued a press release entitled "ADMA Biologics Addresses Misleading Short-Seller Report." The response stated the following:

> [ADMA] today addressed a report issued on March 24, 2026 by Culper Research (the "Short Report"), a firm that has published similarly negative "research reports" regarding public companies after taking short positions in the stock. The Short Report discloses that Culper Research holds a short position in ADMA. ADMA, and its Board of Directors takes seriously its obligations to fairly and accurately report its operating and financial results and make all public disclosures in accordance with the rules and regulations of the U.S. Securities and Exchange

> Commission and in accordance with the standards of U.S. GAAP. The Short Report, by contrast, appears premised on speculative assertions derived from unidentified and unreliable sources and contains numerous misleading, false and inaccurate statements. Despite the conjecture pervading the Short Report, ADMA is taking appropriate steps to review the assertions.

94. On this news, ADMA stock fell $1.34 per share, or 13.9%, to close at $8.29 on March 26, 2026.

95. On March 27, 2026, ADMA issued a press release entitled "ADMA Biologics Issues Statement Refuting Unsubstantiated, Misleading and Inaccurate Allegations by Culper Research." In the release, ADMA stated that demand for ASCENIV was "real and growing" and asserted that Culper's channel-stuffing allegations reflected a "misunderstanding of the commercial dynamics of the IVIG market."

**THE INDIVIDUAL DEFENDANTS SOLD STOCK WHILE THE SHARE PRICE WAS ARTIFICALLY INFLATED**

96. As a result of the false and misleading statements the Individual Defendants caused ADMA to make, the Company's share price was artificially inflated. Defendants Elms, J. Grossman, Guiheen, Tade, Grossman, and Kwon, while in possession of material, nonpublic information, capitalized on the artificially inflated stock price by selling 922,371 shares of ADMA common stock for total gross proceeds of approximately $17,777,505. These insider sales, made with knowledge of material, nonpublic information, demonstrate their motive in facilitating and participating in the wrongdoing.

97. During the Relevant Period, Defendant Elms made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
|---|---|---|---|
| 6/16/2025 | $20.24 | 194,749 | $3,941,719.76 |

| | | | |
|---|---|---|---|
| 6/13/2025 | $20.82 | 137,931 | $2,871,723.42 |
| 6/12/2025[2] | $21.69 | 92,941 | $2,015,890.29 |
| **Total** | | 425,621 | $8,829,333.47 |

98. During the Relevant Period, Defendant J. Grossman made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
|---|---|---|---|
| 6/9/2025 | $21.31 | 10,000 | $213,100.00 |
| 8/29/2024 | $17.27 | 136,861 | $2,363,589.47 |
| **Total** | | 146,861 | $2,576,689.47 |

99. During the Relevant Period, Defendant Guiheen made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
|---|---|---|---|
| 6/9/2025 | $20.96 | 20,000 | $419,200.00 |
| 5/22/2025 | $20.12 | 1,221 | $24,566.52 |
| 5/21/2025 | $20.32 | 7,779 | $158,069.28 |
| 9/9/2024 | $18.47 | 9,000 | $166,230.00 |
| **Total** | | 38,000 | $768,065.80 |

100. During the Relevant Period, Defendant Tade made the following sales while the Company's stock price was artificially inflated:

[2] Transaction made through Aisling Capital II LP, an investment fund affiliated with Defendant Elms.

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
|---|---|---|---|
| 11/22/2024 | $21.15 | 15,000 | $317,250.00 |

101. During the Relevant Period, Defendant Grossman made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
|---|---|---|---|
| 8/26/2024 | $17.69 | 236,889 | $4,190,566.41 |

102. During the Relevant Period, Defendant Kwon made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
|---|---|---|---|
| 8/23/2024 | $18.26 | 60,000 | $1,095,600.00 |

**THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO REPURCHASE ITS OWN COMMON STOCK AT INFLATED PRICES**

103. During the Relevant Period, the Individual Defendants caused the Company to repurchase its own common stock at inflated prices, which substantially damaged the Company. As set forth in the Company's Forms 10-Q and 10-K filed with the SEC during the Relevant Period, the Company purchased 8,673,226 shares of its own common stock, at average share prices of over $15 per share, expending approximately $140,326,225 in total on those repurchases. As the Company's stock was actually worth $8.29 per share, the price at closing on March 26, 2026, the Company overpaid by approximately $68,723,621 for repurchases of its own stock.

**DAMAGES TO ADMA**

104. As a direct and proximate result of the Individual Defendants' misconduct, ADMA has expended and will continue to expend significant sums.

105. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

106. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

107. As a direct and proximate result of the Individual Defendants' conduct, ADMA has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

109. Plaintiff will adequately and fairly represent the interests of ADMA and its shareholders in enforcing and prosecuting its rights.

110. ADMA is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

111. Plaintiff is a current shareholder of ADMA and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will

adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

112. A pre-suit demand on the Board of ADMA is futile and, therefore, excused. At the time this action was commenced, the seven-person Board consisted of Individual Defendants Elms, J. Grossman, Grossman, Finger, Guiheen, Kwon, and Salas (the "Director Defendants"). Accordingly, Plaintiff is only required to show that four Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

113. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

114. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

115. Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully

prosecute such a suit even if they instituted it. For instance, each Director Defendant approved the materially false and misleading 2025 Proxy. By approving, or failing to prevent the Company from issuing, these materially false and misleading statements, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus, demand upon them is futile, and therefore excused.

116. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of ADMA, the Director Defendants knew, or should have known, the material facts surrounding ADMA's financial condition and internal control mechanisms.

117. Defendant Grossman is not disinterested or independent. In addition to serving as a director of the Company, Defendant Grossman has also served as the Company's CEO and President since 2011. Moreover, Defendant Grossman is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period. Thus, as conceded in the Company's proxy statement filed on Schedule 14A with the SEC on April 15, 2026, Defendant Grossman is not independent. Accordingly, demand upon Defendant Grossman is futile, and therefore excused.

118. Defendant J. Grossman is not disinterested or independent. In addition to serving as a director of the Company since 2007, Defendant J. Grossman serves as the Vice Chairman of the Board and is a co-founder of the Company. Defendant J. Grossman served as the Chief Executive Officer of ADMA between 2007 and October 2011. Moreover, Defendant J. Grossman

is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period. Moreover, Defendant J. Grossman is the father of Defendant Grossman. Thus, as conceded in the Company's proxy statement filed on Schedule 14A with the SEC on April 15, 2026, Defendant J. Grossman is not independent. Accordingly, demand upon Defendant J. Grossman is futile, and therefore excused.

119. Defendants Elms, Grossman, J. Grossman, Guiheen, and Kwon each made insider sales of the Company's common stock while the price was artificially inflated as a result of the materially false and misleading statements alleged herein and thus received material personal benefits.

120. Each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

121. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

122. Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

123. Defendants Kwon (Chair), Guiheen, and Salas (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related

to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

124. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

125. Accordingly, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5

126. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127. The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

128. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded to be misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ADMA not misleading.

130. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by ADMA.

131. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and omissions disseminated to the public.

132. As a result of the foregoing, the market price of ADMA common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff relied on the statements described above and/or the integrity of the market price of ADMA common stock in purchasing ADMA common stock at prices that were artificially inflated as a result of the false and misleading statements and was damaged thereby.

133. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134. Plaintiff on behalf of ADMA has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

135. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

136. The Individual Defendants, by virtue of their positions with ADMA and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ADMA and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause ADMA to engage in the illegal conduct and practices complained of herein.

137. Plaintiff on behalf of ADMA has no adequate remedy at law.

## COUNT III

**Against the Director Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

138. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

140. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

141. The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2025 Proxy, which was filed with the SEC. As alleged above, the 2025 Proxy was materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company.

142. The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the reelection of certain of the Defendants to the Board.

143. The materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants J. Grossman and Guiheen, thereby allowing them to continue breaching their fiduciary duties to the Company.

144. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2025 Proxy.

## COUNT IV

### Against the Individual Defendants for Breach of Fiduciary Duties

145. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ADMA's business and affairs.

147. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

148. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ADMA.

149. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

150. In further breach of their fiduciary duties owed to ADMA, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) ADMA engaged in an undisclosed related party transaction; (ii) ADMA used channel stuffing to create an appearance of

revenue; (iii) the Company did not have effective risk oversight mechanisms or internal controls in place; and (iv) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

151. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

152. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

153. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the

Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

154. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

155. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ADMA has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156. Plaintiff on behalf of ADMA has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

157. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ADMA.

159. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from ADMA that was tied to the performance or artificially-inflated valuation of ADMA or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

160. Plaintiff, as a shareholder and a representative of ADMA, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or

valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

161. Plaintiff on behalf of ADMA has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Waste of Corporate Assets

162. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

163. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

164. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, or termination payments to certain of its executive officers, as detailed, *supra*; and (2) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

165. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

166. Plaintiff, on behalf of ADMA, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual

Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: August 26, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399 Email:
lrosen@rosenlegal.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Brent Parris am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed this: 8/25/2026

DocuSigned by:
Brent Parris
3D05AE16C2BA46A...
Brent Parris